UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL NO. 25-00285-1 |
| VERSUS | JUDGE JOSEPH |
| MAHMOUD AMIN YA'QUB AL-MUHTADI | MAGISTRATE JUDGE WHITEHURST |

# MEMORANDUM IN SUPPORT OF DEFENDANT'S OMNIBUS MOTION TO COMPEL SPECIFIC DISCOVERY

NOW INTO COURT comes the defendant, Mahmoud Al-Muhtadi, through undersigned counsel, who respectfully moves, for the reasons set forth below, the Court under Federal Rule of Criminal Procedure 16(a)(1)(B), (E), (F), and (G), *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and the Fifth and Sixth Amendments, for an order compelling the government to answer the defendant's First Request for Specific Discovery (Doc. 47) and Second Request for Specific Discovery (Doc. 70). The government's written responses of June 8, 2026 and July 6, 2026 are attached as Exhibits B and C. A request-by-request schedule showing what the government produced, what it ignored, and what it deferred to CIPA is attached, as a demonstrative aid, at Exhibit A.

## I. Introduction

This is the defendant's omnibus motion to compel specific discovery. The defense has focused this request on discovery that is material to the preparation of

the defense and that only the government possesses or controls. It enforces two requests. The First Request (Doc. 47) seeks the foundation for the six documents the government calls "battlefield evidence" and has moved to admit, and for the testimony of the government's Israeli expert, identified only as "Avi." The Second Request (Doc. 70) seeks the foundation for six audio recordings the government attributes to the defendant on October 7, 2023, and for the Israeli cell-site and location evidence offered to place the defendant's telephone on the Israeli side of the Gaza border. The government answered by two letters, attached as Exhibits B and C. The defendant does not ask the Court to compel the disclosure of classified information, and he does not fight the CIPA process. He asks for the ordinary, unclassified foundation the government possesses or controls through the agencies acting on its behalf: the native files and forensic images of the exhibits, the non-identifying basis and impeachment materials for its expert, the chain of custody, the complete set of recordings, and the technical data underlying the location opinion.

The government's case rests almost entirely on evidence gathered, processed, and interpreted by Israeli agencies and a foreign carrier that acted in cooperation with, and at the direction of, the United States. Because those entities functioned as part of the prosecution team, the foundation the defense seeks is within the government's possession, custody, or control, and the motion asks the Court to compel its production, including the materials in the hands of the cooperating Israeli agencies and the carrier. The defendant reserves the alternative procedures for

obtaining materials abroad, described in Part VII, for later litigation should this motion to compel not result in the requested production. The request-by-request schedule at Exhibit A is a demonstrative aid that shows, for each enumerated request, what the government produced, what it ignored, and what it deferred to CIPA.

One category deserves emphasis. The government produced six recorded calls and represents that it "has turned over to the defense all audio recordings in its possession" (Ex. C at 2). But defense has good cause to believe these six calls are not the entirety of the recorded calls attributed to the defendant or his cell phone from October 7 through October 14 and that the non-produced phone calls contain exculpatory evidence. The government must answer whether the six calls are the complete set of communications collected for the relevant identifiers or a selection from a larger set, who made any selection, and, if the six are a selection, the remainder, so that the six can be evaluated in context. Fed. R. Evid. 106. The defense asks the Court to direct the government to identify and preserve the complete set and to disclose any communication in which the defendant was not identified or was affirmatively excluded as a participant. *Brady v. Maryland*, 373 U.S. 83 (1963).

## II. Relevant procedural background

A superseding indictment charges the defendant with four counts, including conspiring to provide and providing material support to Hamas, a designated foreign terrorist organization, under 18 U.S.C. § 2339B, tied to the events of October 7, 2023,

together with visa-fraud and false-statement counts (Doc. 60). It supersedes the original two-count indictment (Doc. 16). On May 1, 2026, the government moved in limine to admit six documents it describes as "battlefield evidence" collected in Gaza (Doc. 45), and filed a notice of intent to call the expert "Avi" (Doc. 46).

On May 18, 2026, the defendant filed the First Request for Specific Discovery, thirty-five enumerated requests across Sections A through I, together with a Section III protocol governing materials alleged to be held by the government of Israel (Doc. 47). The government answered by letter dated June 8, 2026 (Ex. B). The letter answered a handful of points, agreed to provide unredacted copies of Exhibits 2 and 3 (Ex. B at 1), and stated that "many of the requested items will be addressed in the Government's CIPA filings" (Ex. B at 1). The accompanying FBI production (Bates FBI-534213 through FBI-535695) contains the Holy Land Foundation transcripts and the marked "Avi" excerpts (FBI-534217 through 535680), the native payment ledger (FBI-535688), and the mortar-launcher report in original Arabic and English translation (FBI-535682 through 535687). It does not contain the forensic images, the chain-of-custody records, or the expert-basis materials the request seeks.

On June 26, 2026, the defendant filed the Second Request for Specific Discovery, twenty-three enumerated requests across the audio recordings and the cell-site and location data, together with a Section IV foreign-custody protocol (Doc. 70). The government answered by letter dated July 6, 2026 (Ex. C[1]). The letter

[1] The government's July 6, 2026 letter erroneously states that the defendant's second specific

represents that the government has turned over "all audio recordings in its possession," promises a declassified FBI 302 memorializing a May 2026 interview of an Israeli witness about the six recordings, promises an FBI Cellular Analysis Survey Team expert disclosure no later than September 4, 2026, and defers the remainder to CIPA (Ex. C at 2). The same letter states that "There are a number of classified documents that will be addressed in CIPA litigation, but there is no classified discovery in this case" (Ex. C at 1).

The Court's amended scheduling order set July 7, 2026 as the deadline for any motion to compel discovery (Doc. 66). The defendant files now to meet that deadline and, as to the categories the government has deferred to CIPA, to preserve his position while honoring the CIPA process, as explained in Part VI.

## III. Legal standards

### A. Rule 16 entitles the defense to the items material to preparing the defense within the government's possession, custody, or control

Rule 16(a)(1)(E) requires the government, on request, to permit inspection of documents and objects "within the government's possession, custody, or control" when "the item is material to preparing the defense." Fed. R. Crim. P. 16(a)(1)(E)(i). Rule 16(a)(1)(B) reaches recordings of the defendant. Rule 16(a)(1)(F) reaches the results and reports of scientific tests and examinations. Rule 16(a)(1)(G), as amended effective December 1, 2022, requires the government to disclose a complete statement

discovery request was dated June 18, 2026. (Ex. C). The second specific discovery request was submitted and filed on June 26, 2026. Doc. 70.

of the opinions its expert will offer and the bases and reasons for them. An item is material when it would help the defense test or meet the government's case.

### B. Brady and Giglio reach favorable evidence known to others acting on the government's behalf

Under *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972), the government must disclose evidence favorable to the accused, including impeachment evidence. That duty is not confined to the prosecutor's own files. *Kyles v. Whitley*, 514 U.S. 419 (1995), holds that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Id.* at 437. The prosecutor may not avoid the duty by declining to search sources within the government's reach. *United States v. Auten*, 632 F.2d 478 (5th Cir. 1980) (holding the prosecution cannot avoid its disclosure duty by failing to search readily available sources). And a defendant may rely on the government's representation that its disclosure is complete. *Banks v. Dretke*, 540 U.S. 668 (2004) (rejecting the view that a defendant must scavenge for evidence the government has represented as disclosed).

The Israeli agencies that seized, processed, and analyzed the battlefield evidence acted in cooperation with the FBI and the Department of Justice, which brings their knowledge and materials within the prosecution's disclosure obligation to the extent they acted as part of the prosecution team. *United States v. Antone*, 603 F.2d 566, 570 (5th Cir. 1979) (holding that cooperating state investigators "functioned as agents of the federal government" and "were in a real sense members of the

prosecutorial team"). A prosecutor may not "avoid disclosure of evidence by the simple expedient of leaving relevant evidence to repose in the hands of another agency while utilizing his access to it in preparing his case for trial"; such evidence is "plainly within his Rule 16 'control.'" *United States v. Trevino*, 556 F.2d 1265, 1272 (5th Cir. 1977). Whether another sovereign's agents are treated as acting on the government's behalf turns on whether they act on its behalf or under its control, whether they are part of a team or a joint investigation or share resources, and whether the government has ready access to the evidence. *United States v. Risha*, 445 F.3d 298, 304 (3d Cir. 2006).

Those conditions are met here, and not by assertion alone: as set out in Part V.D, the Cellcom engineer's report reflects that the United States submitted a mutual legal assistance request to Israel to obtain investigative materials for this prosecution and supplied the engineer with the questions his report answers. The Israeli agencies and the carrier gathered, processed, and analyzed this evidence for this prosecution and at the government's direction, and their materials are within the government's possession, custody, or control. The defense reserves the alternative procedures for compelling production from a foreign custodian, described in Part VII, for later litigation should this motion not result in the requested production.

### C. The Confrontation Clause and Rule 16 support disclosure of the basis of the testifying expert

The government intends to authenticate and interpret the six exhibits through "Avi," who will convey to the jury the out-of-court statements of the declarants who

authored the documents and the analysts who processed them. Under *Smith v. Arizona*, 602 U.S. 779, 783 (2024), "[w]hen an expert conveys an absent analyst's statements in support of his opinion, and the statements provide that support only if true, then the statements come into evidence for their truth." An expert "may not . . . simply transmit that hearsay to the jury." *United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008). These principles bear on the materiality of the basis and identity materials the defense seeks; the defense does not ask the Court to resolve any Confrontation Clause objection on this discovery motion.

### D. Due process requires preservation of evidence

The government must preserve evidence whose exculpatory value is apparent. "[E]vidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *California v. Trombetta*, 467 U.S. 479, 489 (1984). Where potentially useful evidence is lost, a due-process violation turns on bad faith. *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988). A specific and repeated defense request for the evidence bears on that inquiry.

## IV. Part one: the battlefield documents and the expert witness "Avi"

The government's own filings show why the defense needs the Part One materials. "Avi" will authenticate the six exhibits by describing how Israeli units seized and processed the devices, by viewing the raw data on the devices, and by "cross-referencing the identifiers listed in the documents (including date of birth, cell

phone numbers, and Palestinian ID numbers) with other databases" (Doc. 46). The defense cannot test that account without the same underlying data. The categories below reach the materials the cooperating Israeli agencies gathered and hold, because those agencies acted as part of the prosecution team.

**A. The forensic images and native files of the six exhibits**

The expert notice states that after seizure the devices' contents are imported to cloud storage, that "the content of the devices is not altered," and that "Avi is able to view the raw data on the devices in the same format that they would appear to a device user" and "where data is saved on the device, including the file path" (Doc. 46; accord Doc. 45-1 at 22). The defense is entitled to the same forensic images, native files, file directories, and hash values, so that it can test whether the exhibits are authentic and unaltered and whether the file paths corroborate the government's attribution (Doc. 47, Requests 6, 7, 8, and 9). The June 8 letter did not address these requests, and the production contains a single native file, the payment ledger at FBI-535688; no forensic image, extraction, directory, or hash value has been produced.

**B. The identities of the declarants and the metadata bearing on attribution**

The six exhibits are out-of-court statements whose authors "Avi" will convey to the jury for their truth. The government agreed to provide unredacted copies of Exhibits 2 and 3 (Ex. B at 1), and the defense accepts that commitment as resolving that item. As to the remainder, the defense seeks the identities of the authors of Exhibits 2, 3, and 4 and of the person who compiled the payment ledger, together

with the metadata and the database cross-references "Avi" used to attribute the documents. Those materials were generated by the Israeli agencies that produced the evidence for this prosecution and are within the government's control (Doc. 47, Requests 3, 4, 5, 28, and 29).

### C. The non-identifying qualifications, methodology, bias, and prior testimony of the expert "Avi"

The government proposes to call its central witness under a pseudonym, stating that "'Avi' is a pseudonym used to protect the witness's identity, which is classified under Israeli law" (Doc. 45-1 at 3; see Doc. 46 at 1 ("Avi will testify under a pseudonym to protect his identity.")). The defendant does not concede that the government's expert may testify anonymously, and preserves that position (Doc. 47, Request 14). But the defendant does not ask the Court to order disclosure of the true name on this motion; if the government maintains that the name is classified, that question belongs in the CIPA process described in Part VI. What the defense seeks now is the material that does not reveal the name: the expert's non-identifying curriculum vitae and qualifications, his methodology and its validation, his compensation and any benefit tied to his cooperation, the materials reflecting institutional bias or interest, and his prior reports and the list of his prior proceedings (Doc. 47, Requests 15, 16, 17, 18, 19, 21, and 24). The defense separately seeks the materials bearing on whether the witness has been associated with findings of intelligence abuse or evidence manipulation, which impeach his reliability because the government will ask the jury to credit his authentication of evidence gathered by

Israeli agencies (Doc. 47, Requests 22 and 23).

The expert notice discloses that "Avi has developed an expertise in authenticating these materials, including a multi-step process for evaluating and authenticating materials from the battlefield" (Doc. 46). Rule 16(a)(1)(G), *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), entitle the defense to the methodology, validation, and comparator materials needed to test that opinion, and to the databases and rosters "Avi" will use to validate the identifications in Exhibits 2 and 3 (Doc. 47, Requests 18 and 24). The June 8 response promised only "Avi's" Holy Land transcripts, which have been produced (FBI-534217 through 535680); it did not address the list of his prior proceedings, his prior reports, or the compensation and bias categories. Compare with the Holy Land trial, where "[t]he Government disclosed to the defense over twenty volumes of material that Avi used to formulate his expert opinion." *United States v. El-Mezain*, 664 F.3d 467, 492 (5th Cir. 2011).

Because the government intends to build its case on this witness's authentication opinion, the materials bearing on his bias, institutional interest, and credibility are impeachment evidence the government must disclose under *Giglio*.

**D. The AMSHAT procedures and the chain of custody within the government's possession**

The reliability of every Part One exhibit depends on the practices of the Israeli unit the government calls AMSHAT. By the government's own description, at AMSHAT "documents are scanned and assigned an ID number" and AMSHAT will

"batch documents and devices to group together documents seized from the same location" (Doc. 46). The defense seeks the AMSHAT protocols and the chain-of-custody records for each device that are within the government's possession (Doc. 47, Requests 1, 2, and 25). The June 8 response stated that the government "has provided all chain of custody documents in its possession" (Ex. B at 1), yet no standalone chain-of-custody record, AMSHAT log, or transfer certificate appears in the production; the government should produce what it possesses or state that nothing further exists. The defense also seeks the identity of the AMSHAT analysts who processed each device and the Israeli authorizations for each seizure (Doc. 47, Requests 26 and 35), which the AMSHAT unit generated in the course of producing this evidence for the United States and which are within the government's control.

**E. The favorable and reliability materials**

The defense seeks any report or communication reflecting doubt about the authenticity of the exhibits, and any material tending to show that an exhibit is fabricated, altered, or unreliable (Doc. 47, Requests 27, 30, and 31). Rather than an order presupposing that such material exists, the defendant asks the Court to direct the government to search the sources within its reach, including materials known to Israeli agencies acting on its behalf to the extent *Kyles* and *Antone* reach them, and to respond. The government's general acknowledgment of a continuing *Brady* obligation is not a substitute for a search and a response.

## V. Part two: the audio recordings and the cell-site and location evidence

Part Two concerns a separate body of evidence: six recorded calls the government attributes to the defendant on October 7, 2023, and the Israeli cell-site evidence offered to place his telephone on the Israeli side of the border. The government represents that there is "no classified discovery in this case" (Ex. C at 1). By that representation, the unclassified technical foundation of this evidence cannot be withheld under a classification label. The defense presses that foundation here, including the records held by the carrier that prepared the location opinion for this prosecution.

### A. The completeness of the recordings and the favorable communications

The government produced six recordings and represents that it turned over "all audio recordings in its possession" (Ex. C at 2). But defense has good cause to believe these six calls are not the entirety of the recorded calls attributed to the defendant or his cell phone from October 7 through October 14 and that the non-produced phone calls contain exculpatory evidence. The government must answer whether the six calls are the complete set of communications collected for the relevant identifiers or a selection from a larger set, who made any selection, and, if the six are a selection, the remainder, so that the six can be evaluated in context. Fed. R. Evid. 106 (Doc. 70, Requests 1, 2, and 9). The defense asks the Court to direct the government to identify and preserve the complete set and to disclose any communication in which the defendant was not identified or was affirmatively

excluded as a participant. (Doc. 70, Request 10). Evidence that a defendant was not where the government places him is favorable and material within the meaning of *Brady* and *Giglio*.

**B. The native recordings, the chain of custody, and the integrity materials**

The defense seeks, for each recording, the original native file in the format in which it was captured, confirmation whether the produced .mp3 is a re-encoding of a master, hash values, and identification of any edit or gap, together with a complete chain of custody (Doc. 70, Requests 6 and 7). The government must lay a foundation that each "recording as played is an accurate reproduction of relevant sounds," *United States v. Biggins*, 551 F.2d 64, 66 (5th Cir. 1977), and the defense cannot test that foundation with only the six .mp3 files it has received. The July 6 response promised a declassified FBI 302 about the recordings (Ex. C at 2); the defense asks that the 302 be produced on a date certain, and that the capture and identifier information, and the legal authority for the interception of each call, including any Israeli wiretap order, military authorization, mutual legal assistance request, Title III order, FISA authorization, or consent, with any application and affidavit, also be produced (Doc. 70, Requests 3, 4, and 5). To the extent any such authorization is classified, the defendant preserves his entitlement on the CIPA track described in Part VI.

**C. The foundation of the cell-site location opinion**

The government's location evidence is the opinion of a Cellcom engineer that the defendant's telephone connected to a single Israeli cell site. The engineer's report

rests on “the subscriber’s call records,” the “matched call records” he matched “with the geographical location of the radio sites,” and “additional technical data” about the “coverage ranges of the radio signals in the area.” The defense seeks each of the items the engineer identifies as a basis for his opinion, together with the complete, unredacted report and a description of the “completely automated process” by which the records were produced and “verified by the corporation’s security department” (Doc. 70, Requests 12, 13, and 16). These are the unclassified foundation the proponent of the opinion must be able to supply. Historical cell-site location analysis is expert testimony subject to Rule 702, and its underlying data and methodology must be disclosed and vetted. *United States v. Hill*, 818 F.3d 289 (7th Cir. 2016) (treating historical cell-site analysis as expert testimony subject to Rule 702 disclosure and reliability review); *United States v. Machado-Erazo*, 950 F. Supp. 2d 49 (D.D.C. 2013) (vetting the reliability of the FBI’s cell-site location methodology under Daubert). As explained in Part VI, the government’s own representation that there is “no classified discovery in this case” forecloses withholding this unclassified foundation under a CIPA label.

### D. The Cellcom and Jawwal records underlying the location opinion

The reliability of the location opinion turns on a cross-border question: whether a telephone using the Palestinian carrier Jawwal inside Gaza would register on the Israeli Cellcom network as an anomaly rather than because it was in Israel. The engineer’s own report asserts that “in the Gaza Strip region and its surroundings,

there is priority for the subscribers of Jawwal network, which is their home network," and that "a Jawwal subscriber located in Gaza would receive the local radio signal at a higher signal strength" (Doc. 70). The Cellcom coverage and propagation data and the Cellcom and Jawwal roaming and registration records that would test those assertions are the data underlying the government's own expert opinion. The engineer's report reflects that this analysis exists because the United States asked for it: it states that "The American law enforcement authorities submitted a request for Mutual legal Assistance from Israel, to obtain investigative materials for [the defendant's] prosecution in the United States," and it further reflects that the "American law enforcement authorities" supplied the engineer with the questions his report answers (FBI-464310). Cellcom thus prepared this opinion for this prosecution and at the government's direction, and the proponent of an expert opinion must be able to produce the data on which it rests; those records are accordingly within the government's control (Doc. 70, Requests 14, 15, 17, 18, 19, and 20). The defendant asks the Court to compel their production.

**E. The favorable location evidence and any fabrication of evidence**

The defense seeks any record reflecting a location inconsistent with the government's theory or acknowledging the accuracy limits of historical cell-site evidence (Doc. 70, Request 22), and any information that an Israeli entity has fabricated, altered, or destroyed any evidence pertaining to Gaza, Hamas, the DFLP, or the events of October 7, 2023 (Doc. 70, Request 23). Because the government

intends to introduce evidence gathered and processed by Israeli agencies, information that any of those agencies has fabricated, altered, or destroyed evidence is favorable and material under *Brady* and *Giglio*, and under *Kyles* it reaches materials known to the agencies acting on the government's behalf. The defendant asks the Court to direct the government to search the sources within its reach, including those agencies, and to produce such materials.

**VI. The government's CIPA deferrals and the defendant's preserved entitlement**

The defense does not ask the Court to compel the disclosure of classified information, and it does not fight the CIPA process. For every category the government has deferred to its CIPA filings, the defendant states that he files now to honor the Court's July 7, 2026 deadline for motions to compel, that he specifically requests the CIPA-designated materials, and that he asserts and preserves his position that he is entitled to them, so that the Court is on notice of both the request and the entitlement even as the mechanics proceed on the CIPA track.

At the same time, the defense holds the government to its own representation that "There are a number of classified documents that will be addressed in CIPA litigation, but there is no classified discovery in this case" (Ex. C at 1). By that representation, the unclassified technical foundation the defense seeks in Part Two, the native audio and its chain of custody and the Cellcom engineer's underlying data, cannot be withheld under a CIPA label, because the government itself says the discovery is not classified. The CIPA track governs classified documents; it does not

convert unclassified discovery into non-discoverable material.

## VII. Reservation of alternative relief if the government does not comply

This motion asks the Court to compel the production of all the responsive materials described above, including those in the hands of the cooperating Israeli agencies and the carrier, because those entities acted as part of the prosecution team and their materials are within the government's possession, custody, or control. If the government responds that it cannot produce a category because the material is held by the government of Israel or by a foreign carrier, the defendant reserves the right to seek the alternative relief the First and Second Requests describe (Doc. 47 § III; Doc. 70 § IV), and asks that the government then provide the foreign-custody accounting those requests require so that the alternative relief can be pursued without delay.

The relief the defense may seek at that time includes an order directing the government to request the materials under the United States–Israel Mutual Legal Assistance Treaty, the issuance of letters rogatory under 28 U.S.C. § 1781, the authorization of depositions of foreign witnesses under Federal Rule of Criminal Procedure 15, see *United States v. Aggarwal*, 17 F.3d 737, 741 (5th Cir. 1994) (stating the standard for a Rule 15 deposition of an unavailable witness), the preservation of all responsive material, and the exclusion of any evidence for which the government cannot supply the corresponding foundation.

## VIII. The defendant requests an evidentiary hearing

An evidentiary or argument-only hearing may help the Court resolve the questions: the scope of the cooperation between the United States and the Israeli agencies that produced the evidence, the manner in which the six recordings were selected from any larger set, and whether the government possesses the technical foundation for the location opinion. The defendant respectfully requests oral argument and an evidentiary hearing at which these matters may be developed.

## IX. Conclusion

For the foregoing reasons, the defendant respectfully asks the Court to grant the motion to the extent set out in the accompanying proposed order, to hold the government to the disclosure commitments its letters describe, and, if the Court finds a hearing would assist it, to set the matter for hearing.

RESPECTFULLY SUBMITTED,

CRISTIE GAUTREAUX GIBBENS
Federal Public Defender

BY: *s/ Dustin C. Talbot*
DUSTIN C. TALBOT
First Assistant / Appellate Chief

*s/ Aaron A. Adams*
AARON A. ADAMS
Assistant Federal Public Defender
Federal Public Defender's Office
Middle and Western Districts of Louisiana
102 Versailles Boulevard, Suite 816
Lafayette, Louisiana 70501
Telephone: (337) 262-6336

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on July 7, 2026, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system. Notice of the filing will be sent by operation of the Court's electronic filing system to all counsel of record.

*s/ Dustin C. Talbot*