# STATEMENT OF BRIDGET PRINCE
# ONE WORLD RESEARCH

## *Experience*

1. I have worked as an international investigator for over 20 years, specializing in the investigation of serious violations of international and domestic law, war crimes and crimes against humanity. My work includes planning and leading complex investigations in conflict and post-conflict settings, conducting trauma-informed and gender-sensitive interviews with witnesses, and preparing evidentiary materials for legal proceedings, including witness statements and expert testimony.

2. Over the last 20 years I have personally conducted investigation trips to countries including Yemen, the UAE, Pakistan, Algeria, India, Morocco, Turkey, Russia, Tajikistan, Djibouti, and Kenya to gather evidence and interview witnesses. In addition, I have remotely organized investigations and the taking of witness statements in multiple other countries. I also provide consultancy and training to legal teams, human rights organizations, and civil society actors on international investigations, investigation strategy, witness interviews, case-building, and litigation support.

3. I am currently the Director of One World Research (OWR), an international investigation organisation, a position I have held since 2010. Between 2007 and 2010 I was the Senior Investigator at OWR. OWR is instructed by a wide range of clients across different sectors and for different purposes. We are instructed by attorneys to conduct independent research and investigations and to provide evidence to courts and tribunals. We are also instructed by NGOs and civil society organizations to facilitate field research. OWR's investigative methodology remains objective and evidence-led, irrespective of the instructing party.

4. Between February 2023 and July 2025, I worked as an Investigator at the United Nations International, Impartial and Independent Mechanism for Syria (IIIM), where I led and supported investigations into war crimes and crimes against humanity committed in Syria since 2011, with a particular focus on the use of child soldiers, detention crimes, and gender-sensitive investigative methodology. Since 2022 I have also contributed to the work of the NGO Accountability Unit, leading investigations into international crimes including genocide and crimes against humanity committed against the Ezidi community.

5. Before joining OWR I worked in 2004–2006 as an investigator for the Habeas Corpus Resource Center focusing on the appeals of men on California's death row. Prior to that, I worked for two years as a private investigator in San Francisco primarily providing investigation services for criminal defense cases. From 2000–2002 I worked as an ethnographer for the University of California, carrying out research on human rights and health issues in San Francisco and Vietnam.

6. My Curriculum Vitae is attached as **Annex 1** to this statement.



DEFENDANT'S EXHIBIT 02

***Education and Training***

7. I hold an MSc in Human Rights from the London School of Economics (2007) and a BA in Philosophy from King's College London (1996).

8. My relevant qualifications and training include:

- 2004: *Trauma-Informed Interviewing* (Habeas Corpus Resource Center)
- 2006: Qualified as *Licensed Private Investigator* in California
- 2010: Qualified as *Licensed Private Investigator* in New York
- 2016: *Advanced Google Search and social media search techniques* (Henk van Ess)
- 2018: *Investigating Cases of Sexual and Gender-Based Violence (SGBV)* (Institute for International Criminal Investigations (IICI)) including modules on interviewing skills; the PEACE model for interviews; working with interpreters and intermediaries; interview documentation; witness management, safety and protection; victim and witness support measures; psychosocial support for investigators.
- 2023: *Social Media and Open-Source Intelligence Research (Aware Online)* including modules on searching for and analyzing open-source data (text, photo, video, audio, phone numbers, email addresses, social media accounts) for use in investigations, and on source verification and fact-checking
- 2024: *Introduction to Intelligence Analysis* (Toddington) covering core analytical concepts, the intelligence process, structured ways of thinking, basic analytic techniques.
- 2024: *Safe and Secure Approaches in Field Environments* (SSAFE) covering field-security and personal-safety protocols for hostile/high-risk environments

9. I have also led training on the following topics:

- 2026: *Interview planning and skills* – UNI Global Union, Online
- 2026: *International Investigations* – Capital Case Defense Seminar, San Diego
- 2024: *International Investigations* – Advancing Real Change, Online
- 2024 *Investigating Core International Crimes* – Defender Days Conference, Stockholm, Sweden.

***Background***

10. In July 2026, OWR was contacted by the Federal Defenders of Louisiana regarding the possibility of investigation assistance in the case of **U.S. v. Mahmoud Al-Muhtadi**. Mr Al-Muhtadi's attorneys asked OWR to advise on and assist with investigation in this case, including the locating and interviewing of a number of witnesses currently based in Gaza. These witnesses were identified as individuals with direct, firsthand knowledge relevant to Mr Al-Muhtadi's legal case.

11. Since 2007 OWR has carried out research and investigations for numerous legal teams representing individuals charged with terrorism offenses involving investigation in several complex locations, including in countries in the Middle East. This has included

witness interviews and fact-gathering for cases heard before state and federal courts in New York, Virginia, Washington D.C., Colorado, Arizona, Illinois, Indiana, and California.

12. Because of the nature of its engagements, OWR frequently conducts investigations in high-risk countries, including locations that are on the US Department of State's Level 4: Do Not Travel advisory level. In order to perform such investigations as safely as possible, OWR carries out a risk assessment prior to the commencement of any investigation. This assessment draws on online background research, consultation with individuals experienced in working in the location in question, and with human rights specialists who can advise on how to conduct the investigation as safely as possible. It includes consideration of risks to investigators, local interpreters, fixers, and potential witnesses.

13. In line with this practice, OWR carried out an assessment for the investigation in Mr Al-Muhtadi's case. Based on this research I have set out below the security and practical considerations I consider relevant to the investigation given the current situation in Gaza where witnesses with relevant information for his legal case have been identified as being currently located.

***<u>Traveling to Gaza</u>***

14. The standard approach in an investigation of this kind is for OWR to travel to the country in question to meet witnesses in person. In cases where this is not possible, OWR commonly travels to neighboring countries and arranges for witnesses to travel to meet with investigators there. I have personally carried out investigations using both of these methods, including traveling to the countries listed above, such as Pakistan and the UAE. I have also brought witnesses to a separate safe country to be interviewed. This has included arranging for Libyan and Syrian witnesses to travel to Turkey, and Somali witnesses to travel to Djibouti.

15. In Mr Al-Muhtadi's case, neither option is currently possible due to the prevailing situation in Gaza. Although a ceasefire has technically been in effect since 10 October 2025, under a US-brokered peace plan, and large-scale fighting has decreased significantly, the ceasefire has been repeatedly violated by both sides. Gaza remains classified at the highest travel-warning level by both the US and UK governments due to the ongoing conflict. As of 23 September 2026, the US Department of State's Travel Advisory for Gaza is at "Level 4: Do Not Travel" due to terrorism, unrest, and limited health infrastructure. It highlights that the security environment within Gaza and at its borders is volatile and extremely dangerous. It also states that US government employees are prohibited from traveling to Gaza for any reason due to safety risks and that the US government cannot provide routine or emergency consular services to US citizens in Gaza.[1] Similarly the UK's Foreign, Commonwealth & Development Office (FCDO) advises against all travel to Gaza and has placed it at its highest level of travel warning. The FCDO confirms that border crossings out of Gaza have been closed to civilians and general traffic since Israeli forces took control of the Rafah Crossing on 6

---

[1] US Department of State, "Gaza Travel Advisory – August 26, 2026", accessed 23 September 2026, https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/Gaza.html

May 2024, that consular support is not available from within Gaza, and that there are currently no exit routes available for foreign nationals to leave Gaza independently.[2]

16. **Leaving and entering Gaza:** There is currently no practical way for an investigator or any other member of the legal team to travel into Gaza to meet witnesses. Equally, witnesses in this case cannot leave Gaza to meet an investigator at this time. The Gaza Strip borders Israel to the east and north, and Egypt to the southwest. Since 7 October 2023, movement to Israel from Gaza has been almost entirely halted, and movement in and out of Gaza is currently extremely restricted.[3] Israeli authorities maintain effective control over all movement of people and goods to and from Gaza.[4]

17. Under the October 2025 ceasefire agreement, the Rafah Crossing has operated partially since 2 February 2026, but only for the limited exit of patients and their companions, and the return of some residents who left Gaza during the war. Exit is capped at 50 patients per day, each with up to two companions. This is a highly monitored procedure requiring referrals and approvals from multiple authorities and operations have been suspended several times since the crossing reopened.[5] The witnesses in this case do not qualify for medical exit and so cannot use this route.

18. The only other operating crossing, Kerem Shalom, is an entry point for goods only. There is currently no movement of people through it. The Zikim Crossing (Erez West) which previously handled goods into northern Gaza has been closed "until further notice" since 24 May 2026.[6]

19. As part of this assessment, I researched the work of other investigators, researchers and journalists who have recently tried to carry out interviews or other documentation work in Gaza. Investigators from the UN's Independent International Commission of Inquiry on the Occupied Palestinian Territory, including East Jerusalem, and Israel (COI OPTEJI) are currently not able to enter Gaza in order to carry out investigations. The COI OPTEJI has recommended that the Government of Israel "allow the Commission access to Israel and the occupied Palestinian territory... to continue its investigations," reflecting the Commission's continued lack of access.[7] Journalists and human rights researchers are also not currently allowed to enter Gaza. Amnesty International's most recent annual report confirms that Israel allowed no independent investigators or international journalists into Gaza during the reporting period, and foreign journalists specifically have been barred from entering Gaza independently since October 2023, a policy that remains in place despite the ceasefire.[8]

---

[2] UK Foreign, Commonwealth & Development Office, "Palestine travel advice", updated 22 July 2026, accessed 21 September 2026, https://www.gov.uk/foreign-travel-advice/palestine

[3] Gisha – Legal Center for Freedom of Movement, "FAQs," https://gisha.org/en/faqs/

[4] Ibid.

[5] Associated Press, "Gaza's Rafah border crossing with Egypt reopens for limited traffic," *NPR*, 2 February 2026, https://www.npr.org/2026/02/02/g-s1-108287/gaza-rafah-border-crossing-reopens. Gisha – Legal Center for Freedom of Movement, "Gaza Now: April 26, 2026," **https://gisha.org/en/gaza-now-april-26-2026/**"

[6] Gisha – Legal Center for Freedom of Movement, "Gaza Now: Facts and Figures", 11 August 2026, https://gisha.org/en/gaza-now-facts-and-figures/

[7] Independent International Commission of Inquiry on the Occupied Palestinian Territory, including East Jerusalem, and Israel, *Legal analysis of the conduct of Israel in Gaza pursuant to the Convention on the Prevention and Punishment of the Crime of Genocide*, UN Doc. A/HRC/60/CRP.3 (16 September 2025), para. 256, https://www.ohchr.org/sites/default/files/documents/hrbodies/hrcouncil/sessions-regular/session60/advance-version/a-hrc-60-crp-3.pdf

[8] Amnesty International, "Israel and the Occupied Palestinian Territory 2025," *Amnesty International Report 2025/26*, https://www.amnesty.org/en/location/middle-east-and-north-africa/middle-east/israel-and-the-occupied-palestinian-

***Using local consultants***

20. In other cases, where travel to the location in question was not possible and meeting the witnesses in another country was also not possible, I have arranged for a local consultant based in the location in question to carry out in-person interviews. This includes investigations in Somalia, Iraq, Afghanistan, Mali, and the Democratic Republic of the Congo among others.

21. In order to find such a consultant, I usually look to NGOs, local lawyers, researchers or journalists - individuals who have the skills to meet with witnesses and take statements to a standard usable in a US court case.

22. I carried out research to assess whether this would be possible in Mr Al-Muhtadi's case. Due to the recent conflict and ongoing unstable situation, the community I would usually turn to for help finding and speaking to witnesses is operating with severely reduced capacity in Gaza. For example, NGOs are facing a very difficult operating environment. In December 2025, Israel announced it would revoke the licenses of 37 international aid organisations for failing to meet new registration requirements.[9]

23. Some Palestinian NGOs, including those working in Gaza, are also under US sanctions for engaging with the International Criminal Court (ICC).[10] Three leading Palestinian human rights organizations (Al-Haq, Al-Mezan Center for Human Rights, and the Palestinian Centre for Human Rights) have been sanctioned. The three organizations are globally respected, among the most effective and reliable at documentation work, and would usually be a suitable source of potential assistance in my investigations.[11] Foreign individuals and corporations that materially support a designated person or entity may themselves be sanctioned, effectively extending the reach of these measures worldwide.[12]

24. Local journalists, to whom I would also usually look for this kind of investigation assistance, are similarly diminished in number: at least 209 Palestinian journalists and media workers have been killed by Israel in Gaza or in Israeli detention since October

---

territory/report-israel-and-the-occupied-palestinian-territory/; Al Jazeera, "World's top media outlets urge Israel to allow independent access to Gaza," 30 April 2026, https://www.aljazeera.com/news/2026/4/30/media-organisations-call-on-israel-to-allow-independent-access-to-gaza

[9] United Nations Office of the High Commissioner for Human Rights, "Israel: Ban on 37 aid groups makes life unbearable for genocide survivors in Palestine, say UN experts," January 2026, https://www.ohchr.org/en/press-releases/2026/01/israel-ban-37-aid-groups-makes-life-unbearable-genocide-survivors-palestine; The Times of Israel, "Israel vows to enforce ban on 37 aid groups in Gaza as deadline passes," January 1, 2026, https://www.timesofisrael.com/israel-vows-to-enforce-ban-on-37-aid-groups-in-gaza-after-deadline-passes/

[10] Al-Haq, Al-Mezan Center for Human Rights, and the Palestinian Centre for Human Rights, "Open Letter to the President of the Assembly of States Parties to the Rome Statute: Palestinian Organisations Call on President to Take Action Against U.S. Sanctions", 1 December 2025, https://pchrgaza.org/open-letter-to-the-president-of-the-assembly-of-states-parties-to-the-rome-statute-palestinian-organisations-call-on-president-to-take-action-against-u-s-sanctions/

[11] United Nations Office of the High Commissioner for Human Rights, "UN experts dismayed by US sanctions against Palestinian human rights organisations", 22 September 2025, https://www.ohchr.org/en/press-releases/2025/09/un-experts-dismayed-us-sanctions-against-palestinian-human-rights ; The White House, "Imposing Sanctions on the International Criminal Court", 6 February 2025, https://www.whitehouse.gov/presidential-actions/2025/02/imposing-sanctions-on-the-international-criminal-court/

[12] Just Security, "Raising the Cost of US Coercion: Sanctions on the ICC," https://www.justsecurity.org/119583/raising-the-cost-us-coercion-icc/; Office of Foreign Assets Control, U.S. Department of the Treasury, "Inflation Adjustment of Civil Monetary Penalties," Federal Register, 15 January 2025, https://www.federalregister.gov/documents/2025/01/15/2025-00786/inflation-adjustment-of-civil-monetary-penalties; 50 U.S.C. §§ 1701 et seq. (International Emergency Economic Powers Act).

2023.[13] Journalists who remain face further constraints on their ability to work. As of June 2026, the Committee to Protect Journalists had documented 108 arrests of journalists and media workers in Israel, the West Bank, Gaza, and Jerusalem since the start of the war, often without charge.[14]

25. **Risk to local consultants:** Even if I could find someone locally to assist with interviewing witnesses, I do not believe it would be safe in the current climate for an individual to be working on Mr Al-Muhtadi's case. Anyone assisting would risk being accused of ties to Hamas because of the nature of the charges in this case, and would therefore themselves be at risk of being targeted by Israel. Israel has a documented pattern of publicly accusing individuals in civilian, humanitarian, and professional roles in Gaza, including UNRWA staff, of Hamas affiliation, at times without providing supporting evidence. In April 2024, an independent review commissioned by the UN Secretary-General found that Israel had publicly claimed that a significant number of UNRWA employees were members of terrorist organizations, but had yet to provide supporting evidence for this.[15]

26. A similar pattern has been documented in relation to journalists. The Committee to Protect Journalists has documented the systematic labeling of Palestinian journalists as "terrorists" without substantiated evidence. Israeli intelligence sources have reported that the Israeli military operated a unit tasked with identifying Gaza-based journalists who could be portrayed as Hamas operatives, in an effort to counter international criticism of the killing of journalists.[16]

27. Equally, Hamas-affiliated forces in Gaza have carried out summary executions and other violence against individuals accused of collaborating with Israel, including as recently as July 2026.[17] A June 2026 report by the UN Commission of Inquiry identified 249 cases of extrajudicial executions and severe physical violence in Gaza between August 2024 and January 2026, at least 60 of which involved Hamas-affiliated forces. Some of these executions have been carried out publicly and publicised on Hamas-affiliated channels.[18] In Gaza, the US is widely seen as closely aligned with Israel in the

---

[13] Committee to Protect Journalists, "CPJ undertakes review of its documentation of journalists killed in Israel-Gaza war since 2023," June 25, 2026, https://cpj.org/2026/06/cpj-undertakes-review-of-its-documentation-of-journalists-killed-in-israel-gaza-war-since-2023/. CPJ has removed 20 names from its database following review, including eight individuals later established to have been Hamas or Palestinian Islamic Jihad combatants.

[14] Committee to Protect Journalists, "Arrests of Palestinian journalists since start of Israel-Gaza war," 3 June 2026, https://cpj.org/2023/10/arrests-of-palestinian-journalists-since-start-of-israel-gaza-war/

[15] Independent Review Group on UNRWA (chaired by Catherine Colonna), *Final Report*, April 2024, reported in UN News, "Independent review panel releases final report on UNRWA," April 22, 2024, https://news.un.org/en/story/2024/04/1148821. In August 2024, the UN Office of Internal Oversight Services found that nine of 19 UNRWA staff accused by Israel may have been involved in the October 7 attacks, and they were dismissed. UNRWA, statement of August 5, 2024, https://www.unrwa.org/newsroom/official-statements/investigation-completed-allegations-unrwa-staff-participation-7-october

[16] Committee to Protect Journalists, "CPJ documentation of Israeli harm against Palestinian journalists, media workers," April 2026, https://cpj.org/2026/04/cpj-documentation-of-israeli-harm-against-palestinian-journalists-media-workers/; Yuval Abraham, "'Legitimization Cell': Israeli unit tasked with linking Gaza journalists to Hamas," *+972 Magazine*, August 14, 2025, https://www.972mag.com/israel-gaza-journalists-hamas-hasbara/

[17] UN Human Rights Office in the Occupied Palestinian Territory, "OHCHR condemns the killing of a Palestinian man accused of collaborating with Israeli forces by a group affiliated with Hamas," 7 July 2026, https://palestine.un.org/en/node/318782

[18] Amnesty International, "Palestine: Hamas must stamp out extrajudicial executions and ensure justice for victims," 20 August 2026, https://www.amnesty.org/en/latest/news/2026/08/palestine-hamas-must-stamp-out-extrajudicial-executions-and-ensure-justice-for-victims/

conflict. It is Israel's principal military supporter, and since the ceasefire it has led the Civil-Military Coordination Center, which hosts US and Israeli military personnel and oversees the ceasefire.[19] Anyone assisting with an investigation connected to a US court case could, in my opinion, be perceived as collaborating with the US and therefore Israel. This is so even though the investigation is being carried out on behalf of Mr Al-Muhtadi's defense team, the Federal Defenders of Louisiana. In my experience, people outside the US legal system rarely distinguish between the defense and the prosecution, and in Gaza any contact with a US legal process could be easily misconstrued.

***Risk to witnesses***

28. The same risks set out above apply equally to the witnesses themselves. A person who agrees to act as a witness in connection with Mr Al-Muhtadi's case could risk being perceived by Israeli authorities as having links to Hamas, and by Hamas-affiliated forces as collaborating with the US and therefore Israel.

***Carrying out remote interviews***

29. The only remaining option for carrying out this investigation is to interview witnesses remotely. Remote interviews are used in investigations and legal fact-finding where in-person access is not possible, and can produce reliable evidence provided their limitations are recognised and appropriately mitigated. Based on my training and experience, I consider remote interviews present some limitations compared to in-person interviews. Not being in the same room can make it somewhat harder to build rapport, read non-verbal cues, and manage the pace of an interview if a witness becomes distressed. Where an interpreter is required, coordinating a three-way dynamic between witness, interpreter, and investigator adds a further layer of difficulty to communication and rapport-building.

30. When carrying out remote interviews the confidentiality of the investigation cannot be guaranteed because a phone or video call is more vulnerable to interception or monitoring than an in-person conversation. Israeli authorities are reported to conduct extensive surveillance of mobile phone communications in Gaza, including monitoring calls and tracking location data.[20] Even if secure messaging apps such as Signal are used, their protection can be bypassed by spyware such as Pegasus which was developed by an Israeli company and is reported to be in use in the region.[21] Such spyware can be installed without any action by the phone's owner, and once installed, it can covertly access calls, messages, and other data directly from a device with no obvious trace of its existence. This means that encryption or secure messaging apps offer no protection once a phone itself is compromised.[22] In addition to the lack of confidentiality for the investigation, this may also place a witness at greater risk given the security concerns set out above.

---

[19] The Times of Israel, "Some European countries rethink participation at US-led Gaza coordination center," January 20, 2026, https://www.timesofisrael.com/some-european-countries-rethink-participation-at-us-led-gaza-coordination-center/
[20] Human Rights Watch, "Questions and Answers: Israeli Military's Use of Digital Tools in Gaza", 10 September 2024, https://www.hrw.org/news/2024/09/10/questions-and-answers-israeli-militarys-use-of-digital-tools-in-gaza
[21] "Palestinian activists hacked by Israeli firm NSO spyware: Report," 8 November 2021, https://www.aljazeera.com/news/2021/11/8/palestinian-rights-activists-hacked-by-israeli-firm-nso-group.
[22] Britannica, Samuel Greengard, "Pegasus (spyware)", 24 July 2026, https://www.britannica.com/topic/Pegasus-spyware

31. **Communications:** Carrying out remote interviews requires stable access to internet or cell phone service. Before the conflict, Gaza had only two internet and cell service providers (Paltel and Ooredoo) and Israeli restrictions have long limited Gaza's cellular service to 2G, an outdated standard largely phased out elsewhere.[23] Much of this infrastructure has since been destroyed. By October 2024, an estimated 75% of Gaza's telecommunications infrastructure had been damaged, with at least 50% completely destroyed.[24] By early 2025, 64% of mobile phone towers remained out of service, with coverage in some areas, such as Rafah had collapsed to as little as 27% of pre-war levels.[25]

32. **Power cuts affecting phone calls:** For the internet or cell service to function there also needs to be stable access to electricity. Israel cut off the direct electricity supply to Gaza at the start of the war in October 2023, and has restricted the entry of fuel, meaning electricity is now produced almost entirely through scarce generators and solar panels, with operating hours reduced due to fuel and parts shortages.[26] This has continued despite the October 2025 ceasefire. **As of** April **2026,** Israel continued to block the supply of electricity to Gaza, other than a single line to one water desalination facility, and to prohibit the entry of fuel for Gaza's sole power plant. The Gaza Electricity Distribution Company reported that over 5,000 kilometres of power lines and more than 2,200 transformers had been destroyed.[27] This directly affects any communications with witnesses. Without reliable power, phones cannot be charged and mobile network infrastructure cannot run consistently.

33. **Locations of interviews:** Conducting a remote interview also requires the witness to have access to a private, quiet location from which to speak safely and without interruption. This is a further significant challenge for witnesses in Gaza. As of May 2026, some 1.7 million people were living in around 1,600 displacement sites across Gaza, nearly 88 percent of them in makeshift sites.[28] A witness in these circumstances may have no home of their own left to speak from and may have no private space in which to discuss sensitive material without being overheard by others whose presence could compromise the witness's safety or the confidentiality of the interview.

34. **Depositions:** Even if it is possible to carry out remote interviews, it is not clear how any witnesses could later participate in depositions in a secure and safe way. I have previously assisted with identifying appropriate locations for depositions, including for witnesses located in places such as Iraq and Somalia. In addition to issues with communications detailed above, identifying a suitable location for a deposition so that the court and the government could participate presents a number of difficulties in Gaza.

---

[23] NPR, "Destruction from the war with Israel has cut Gaza off from the outside world," 3 March 2024, https://www.npr.org/2024/03/03/1229402063/gaza-communications-cell-phone-internet-service-blackouts-paltel

[24] 7amleh – The Arab Center for the Advancement of Social Media, "7amleh Issues New Report on the Impact of War on Gaza's Telecommunications Infrastructure," 29 October 2024, https://7amleh.org/post/1494

[25] Al Jazeera, "Gaza's tech workers code from rubble as Israel's war destroys digital life," 19 December 2025, https://www.aljazeera.com/news/2025/12/19/gazas-tech-workers-code-from-rubble-as-israels-war-destroys-digital-life

[26] Gisha – Legal Center for Freedom of Movement, "Israel's war on electricity", 19 April 2026, https://gisha.org/en/israels-war-on-electricity/

[27] Ibid.

[28] United Nations Office for the Coordination of Humanitarian Affairs (OCHA), "oPt: Humanitarian Situation Report | 25 May 2026," May 25, 2026, https://www.unocha.org/publications/report/occupied-palestinian-territory/opt-humanitarian-situation-report-25-may-2026

There has never been a US embassy or consulate in Gaza itself. The nearest US diplomatic mission is the US Embassy in Jerusalem.[29] As set out above, witnesses in Gaza cannot travel there as there is currently no practical way for them to leave Gaza.

35. In Gaza, the buildings that would normally be used for formal proceedings such as courts and government offices have themselves been destroyed. In December 2023, the Israeli military destroyed Gaza's Palace of Justice, which housed the Palestinian Supreme Court, Court of Appeal, Court of First Instance, and Magistrate's Court.[30] More broadly, as of August 2026, about 82 percent of all structures in Gaza had sustained damage, and the number of destroyed structures had increased by around nine percent since the October 2025 ceasefire, according to satellite assessments by the UN Satellite Centre (UNOSAT).[31] Even where a building survives, the question of who controls it is unresolved. About 30 percent of Gaza remains under Hamas' control, and although Hamas reportedly said in July 2026 that it would dissolve its civilian administration as part of the US-brokered peace deal, many institutions and government offices are still operating as usual.[32]

36. In situations where court or other official buildings are not available, I have looked for a location that can offer a secure, private room away from public areas and a neutral, professional setting. A well-run hotel with business or conference facilities will often meet these requirements. What might have been appropriate hotels in Gaza, such as the Al Mashtal Hotel and the Al Deira Hotel, were bombed and destroyed during the war.[33]

***Current status of the investigation***

37. In spite of the above issues, I have made efforts to begin the investigation in Mr Al-Muhtadi's case by making initial calls to potential witnesses in Gaza. In practice, the internet signal is often not strong enough and there is often no power. In my efforts so far, calls have cut out after only a few seconds, sometimes not resuming for hours. Video calls are possible only for a matter of minutes and in order to keep the connection the video must be turned off. As an interpreter is needed, this adds a further person to the call, which makes an already difficult connection harder still to maintain. Scheduling calls in advance has also proved difficult, since even where a time is agreed, there is no way to know whether power or signal will be available at that time.

---

[29] U.S. Department of State, "Gaza Travel Advisory – August 26, 2026" (listing U.S. Embassy Jerusalem, 14 David Flusser Street, Jerusalem, as the point of assistance for U.S. citizens in Gaza), accessed September 23, 2026, https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/Gaza.html

[30] United Nations Office of the High Commissioner for Human Rights, "Israel/Gaza: UN experts condemn destruction of judicial infrastructure, call for protection of justice operators", 16 April 2024, https://www.un.org/unispal/document/israel-gaza-un-experts-condemn-destruction-of-judicial-infrastructure-call-for-protection-of-justice-operators-ohchr-press-release

[31] UN News, "Gaza: Destruction of buildings rises by nearly 10 per cent since ceasefire," August 13, 2026, https://news.un.org/en/story/2026/08/1168138; UN Operational Satellite Applications Programme (UNOSAT), "UNOSAT Gaza Strip Comprehensive Damage Assessment – 11 October 2025," Humanitarian Data Exchange, https://data.humdata.org/dataset/damage-assessment-gaza-strip-11-october-2025

[32] DW, Tania Krämer, Hazem Balousha, "Palestinians in Gaza: Stuck between Hamas and Israel", 15 July 2026, https://www.dw.com/en/palestinians-in-gaza-stuck-between-hamas-and-israel/a-77956421

[33] The National, "Why Gaza's only five-star hotel is a symbol of destruction – but also economic promise," 7 October 2024, https://www.thenationalnews.com/business/property/2024/10/06/gaza-israel-property-economy/; The Guardian, "Destruction of the Palestinian cultural heritage of Gaza – in pictures," 11 January 2024, https://www.theguardian.com/world/gallery/2024/jan/11/palestinian-cultural-heritage-gaza-destruction-in-pictures.

38. Some of the buildings in which the witnesses are staying have no windows or doors, making it difficult to find a location private enough to carry out witness interviews. Despite my efforts to use the most secure communications available to me, I cannot be sure that these calls are not being monitored as set out above.

39. Building rapport with witnesses and carrying out full witness interviews in these conditions is difficult. Interviews of this kind ordinarily depend on being able to speak with a witness without interruption, over a sustained period of time, and to build sufficient trust for the witness to feel comfortable discussing sensitive material. In the current circumstances, I have only been able to speak to witnesses in short, disconnected fragments, with no certainty as to when or whether a conversation can be resumed. This has made it difficult to properly introduce myself, explain the purpose and process of the interview, and establish the kind of rapport that this work ordinarily requires.

***Conclusions***

40. OWR has a track record of carrying out investigations in complex, conflict-affected settings. However, for the reasons set out above, I do not consider it currently possible to conduct a full investigation in Mr Al-Muhtadi's case. Travel to Gaza by an investigator is not possible in the current circumstances, nor is it currently possible for witnesses to leave Gaza. In addition, there are significant challenges to identifying a suitable local consultant to conduct interviews in person, and asking them to assist on this case would place that individual at serious risk given the pattern of violence against those perceived to be collaborating with Israel by Hamas, and the risks faced by journalists and others whom Israel has accused of Hamas affiliation, as set out above. Remote interviews, while the only option remaining, are severely constrained by unreliable power and connectivity, an inability to guarantee the confidentiality of any call, and the practical difficulty of building the rapport and trust that this kind of work ordinarily requires. Facilitating a formal deposition would also present significant practical challenges at this time given the travel restrictions, the destruction of the buildings that would normally be used for such proceedings and the ongoing communication challenges as set out above.

41. My greatest concern, however, is for the safety of the witnesses themselves. As set out above, a witness who agrees to be interviewed in connection with this case could be perceived by the Israeli authorities as having links to Hamas, or by Hamas-affiliated forces as collaborating with the US, and therefore Israel. Unlike an investigator or consultant, a witness may not be able to withdraw from that risk once their connection to the case becomes known. Participation in this case may therefore carry significant risk for the witnesses. Even where a witness agrees to accept that risk, my ability to protect them is very limited. If the investigation proceeds in this case it will do so in the knowledge that these risks and practical barriers cannot be fully mitigated.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Bridget Prince ______________________ Date: 09.23.2026

Bridget Prince
Director, One World Research