UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

UNITED STATES OF AMERICA

v.

MAHMOUD AMIN YA'QUB AL-MUHTADI,

Defendant

CRIMINAL NO. 6:25-cr-00285
JUDGE JOSEPH
MAGISTRATE JUDGE WHITEHURST

**USA'S REPLY TO DEFENDANT OPPOSITION TO MOTION *IN LIMINE* AS TO PROPAGANDA, EXPERT TESTIMONY, AND FBI LAY TESTIMONY**

The Government filed an omnibus Motion *In Limine* to Permit Various Forms of Evidence at Trial on September 15, 2026. [Doc. 100]. The defense responded with several filings, including an Opposition on September 29, 2026, challenging Sections III.C, III.E and III.J of the Motion. [Doc. 130]. The Government files this Reply.

**ARGUMENT**

***A. DFLP and HAMAS Propaganda During and After 10/7 Directly Proves the Defendant's Material Support Charges and are Admissible for the Reasons Set Forth in the Motion.***

Among other issues in its motion *in limine*, the Government seeks a pre-trial ruling that "evidence of propaganda materials published by DFLP, NRB, and HAMAS through their Telegram channels and other media before, during, and shortly after 10/7." [Doc. 100 at 12-13]. The rationale for admissibility is sound based on two exceptions to the rule against hearsay. That is, the materials are co-conspirator statements and statements against penal interest. *Id.* They are also admissible "for the non-hearsay purpose of showing that the 10/7 attack materially supported

HAMAS's recruiting efforts and the Defendant's intent, knowledge, and motive in perpetrating the attack." *Id.* at 13.

The defendant cites *El-Mezain,* 664 F.3d 467 at 502, 505-507 (5th Cir. 2011) in a vain effort to suggest that pronouncements on HAMAS and DFLP official channels do not qualify as co-conspirator statements under FRE 801(d)(2)(E). He is mistaken. Time and again, the government has articulated that the October 7 attack was a HAMAS-led conspiracy. DFLP joined that conspiracy; NRB joined that conspiracy; the defendant, a longtime DFLP/NRB member, personally joined that conspiracy and provided material support to HAMAS in the form of himself as personnel, as well as resources including weapons and ammunition on the day of the attack, as evidenced by intercepted calls from that morning.

The government takes issue with the characterization of terrorist propaganda as anonymous. It was not anonymous; it was official. This crime occurred in 2023, well into the era of social media. A MEMRI witness and Professor Hoffman, a preeminent expert in his field, will explain that terrorist organizations maintain accounts on media such as Telegram both to recruit adherents and to trumpet their victories. To this day, DFLP has never removed statements from its Telegram account that were posted on October 7 taking credit for DFLP's participation in the "Al-Aqsa Flood operation" – the name given to the attack by HAMAS leader Mohammed Deif when he issued his call to arms at 7:53 a.m. on October 7. [Doc. 1, criminal complaint, ¶ 9]. By the morning of the attacks, the defendant had identified himself for years as a member of DFLP and NRB. *Id.* ¶¶ 28-44. It may be

inconvenient for the defendant that DFLP issued statements and photos of the attack on the day of October 7 while it was ongoing, but he cannot seriously maintain that they fall outside the scope of the conspiracy.

The defendant's treatment of *Saipov*, *Cornett*, and *Musaibli* all underline the relevance the propaganda materials here have. The defense claims that *Saipov* is distinguishable because it involved an "enterprise" instead of a "conspiracy," Opp. at 11, but provides no law to support that distinction mattering. And beyond that, it confuses the conspiratorial aspect of the Defendant's crime and the actual material support he provides: as the Motion explains, the propaganda materials using the 10/7 attack to promote and glorify HAMAS lie at the very heart of supporting the organization, and the 10/7 attackers provided just that to HAMAS. Indeed, the defense in describing *Saipov* ignores the words coming right after enterprise: "proof of the enterprise, and to demonstrate Saipov's intent, motive, and purpose behind committing the charged crimes." *United States v. Saipov*, 2023 U.S. Dist. LEXIS 93114, at *12 (S.D.N.Y. May 23, 2023). The *Saipov* court further found that "[t]he terrorist propaganda material is also relevant to show Saipov's knowledge of ISIS, which is necessary … to show Saipov was providing material support to a terrorist organization." *Id.* Suffice to say, *Saipov* echoes the same relevance arguments the Government advances here on the many fronts that this propaganda evidence is relevant in a material support prosecution. And indeed, the defense appears to acknowledge the value of propaganda to these organizations later in its Opposition when faced with a different type of argument. *See* Opp. at 12 ("An organization's claim

of credit for an attack is made to win recruits and prestige. A claim of credit serves the organization's interest ...").

The defense fairs no better with *Cornett*. In *Cornett,* the circuit court found that the district court in a drug conspiracy prosecution improperly admitted a wide-ranging, recorded conversation with an informant that was not made in furtherance of the conspiracy. *United States v. Cornett,* 195 F.3d 776, 785 (5th Cir. 1999). The matter at hand differs in at least two respects. *First,* there is no temporal attenuation here, with the DFLP issuing its propaganda pronouncements in real time on October 7, as the attacks were ongoing. Indeed, the HAMAS invasion was not repulsed until much later, on October 8, such that the official statements by DFLP on October 7 were meant to exhort others to join the attack. But even more fundamentally, the propaganda statements were made in furtherance of the ends of materially supporting HAMAS as an organization by promoting its handiwork, which is a natural part of the story about why the 10/7 attack materially supported HAMAS as an entity. As for the defense assertion that the official pronouncements in which DFLP actively claimed credit for a globally significant mass casualty event was not inculpatory in nature, *see* Opp. at 11-12, that is simply absurd.[1]

And the defense remains out-to-sea in its use of *United States v. Musaibli,* 42 F.4th 603 (6th Cir. 2022). The documents at issue in *Musaibli,* which the Sixth Circuit

[1] The exhibits submitted with the Government's motion *in limine* [Doc. 100] are meant to be illustrative of the sort of evidence the government intends to introduce at trial, not definitive. For this reason, the Government declines to address specific 401 and 403 objections in the defense opposition. [Doc. 130 at 14-15].

held were admissible, were administrative in nature used to establish the defendant's membership in ISIS, much as the government is prepared to introduce documents establishing the defendant's ties with DFLP, *see* [Doc. 45]. And the *Musaibli* court recognized that "[a]s the records from ISIS's database attest, the conspiracy at issue was large," with "[t]he alleged conspiracy of which Musaibli was a part [] providing ISIS with material support and resources in the form of personnel." *Musaibli*, 42 F.4th at 618. Rather, the *Musaibli* court's point in describing the conspiracy's scope was that it did not encompass "statements made by those offering services and personnel to *other* terrorist groups," for example. *Id.* (emphasis in original).[2] The propaganda videos at issue here were public pronouncements in which DFLP took credit for its participation in the October 7 attacks while it was ongoing. Just as the documents in *Musaibli* linked the defendant to ISIS, the propaganda videos at issue here link the defendant to the HAMAS-led conspiracy on October 7. And while the defense also points, as it so often does, to the October 7 "on or about" charging date as defining the conspiracy, Opp. at 9, it again misapprehends that the October 7 date reflects the Defendant's conduct but not the full scope of the material support he provided. The 10/7 attack had immediate ramifications for HAMAS and for the entire Middle East region, including respecting the propaganda declarations that HAMAS

[2] And while the defense points to four days of evidentiary hearings and requests a "comparable showing," Opp. at 9, the *Musaibli* court gave no indication that such extensive hearings were required, with its pointing to facts suggesting otherwise. *See* 42 F.4th at 618 (noting, as to a conspiracy's existence, that "Musaibli's own words supported the existence of a conspiracy to provide ISIS with personnel and services. His confession detailed how he and others went through training and swore allegiance to ISIS as part of their enrollment in the unit.").

and its associated groups such as DFLP made that same day and in the immediate days to follow. The Defendant's acts that day, by contributing to the attack that permitted that propaganda to flow, finds him situated no differently than the many cases where courts have admitted propaganda evidence. *See* Mot. at 13.[3]

### *B. Professor Hoffman's Testimony Falls Squarely Within Permissible Expert Opinion.*

The defense concedes that Professor Hoffman may testify as to the "history, structure, and leadership" of DFLP, NRB, and HAMAS. Opp. at 15. But it then objects to three other aspects of Professor Hoffman's testimony: (1) that terrorist organizations use propaganda to promote their activities and establish credibility by putting out reliable materials, Opp. at 16, (2) his discussion of the attack in Kfar Aza and Nahal Oz while identifying that HAMAS and NRB were involved, Opp. at 16-17, and (3) that terrorist groups police the use of their insignia by those who are not members of the group.[4] The defense is wrong on all three fronts.

---

[3] The defense tosses in some Rule 403 arguments as well, *see* Opp. at 14-15, but it fails to meet the extraordinarily high bar for relief. Its complaints amount to the notion that any depictions of attacks "invites the jury to infer that because fighters wearing NRB insignia took part in the attack somewhere, Mr. Al-Muhtadi must have been among them." Opp. at 14. Of course, as with any evidence the Government puts on, the purpose of the evidence is to show that the Defendant's associated group was present and participating in the attack. And the Government's intent is that all its evidence, taken together, will prove beyond a reasonable doubt that the Defendant was indeed among the perpetrators of the 10/7 terrorist attack. But the defense gives no cause grounded in law for this Court to exclude these materials on that basis, with the presence of NRB attackers circumstantial evidence the Government is well within its rights to present.

[4] The defense appears to claim that the Government did not already provide its Rule 16 disclosures as to Professor Hoffman's testimony, *see* Opp. at 16 ("the defense reserves its Rule 403 and Rule 702 objections to them until the government discloses

*First*, as to Professor Hoffman's testimony that terrorist organizations use propaganda to promote their activities and establish credibility by putting out reliable materials, the defense is mistaken in claiming that "[t]hat is an opinion that the propaganda is true." Opp. at 16. Instead, the testimony is about the nature of terrorist organizations and their use of media, with the jury to decide how much to weigh Professor Hoffman's background when it views the HAMAS and NRB propaganda. In this way, the testimony is no different than a gun-and-drug expert might testify that the presence of a firearm alongside scales, baggies, and pound quantities of cocaine is consistent with drug trafficking. That testimony does not find the expert testifying on the ultimate issue but instead provides the jury necessary context for it to understand the evidence before it, with the defense free to cross-examine the expert to attack the credibility of that context.

*Second*, as to Professor Hoffman identifying HAMAS and NRB insignia in videos of the 10/7 attack, the defense is wrong to claim that Professor Hoffman cannot testify about historical facts about 10/7 to give an overlay of the attack. The defense appears to concede its own point on the identifying insignia when mounting its third challenge, noting that "*El-Mezain* permitted testimony associating headbands in a video with Hamas, where two experts testified that the headbands were associated with Hamas." Opp. at 17 (quotations omitted).

---

the opinions it will elicit"), but the Hoffman Expert Report generally describes each item and what he will say about them.

*Third*, as to terrorist groups policing the use of their insignia, the defense objects based on the notion that it opines on the ultimate issue. As the defense would have it, "the intended inference is that anyone who wore NRB insignia was a formally inducted member, and therefore a member on October 7," which is "a disputed question the jury must decide." Opp. at 17. The defense fails, however, to cite a case suggesting that experts cannot provide testimony whose "inference" is that something is true—indeed, as again with gun-and-drug experts, that is almost always the entire purpose of the testimony, and well within the purview of an expert to testify as to.

The reality is that the defense also takes issue with expert testimony on aspects of terrorist propaganda, Doc. 130 at 16, but the jury will make its own conclusions about whether photos and videos of the October 7 attacks are truthful and accurate. Likewise, Professor Hoffman's testimony on the attacks on Nahal Oz and Kfar Aza will follow the testimony of percipient witnesses who survived the attacks, and he will place the witness testimony in a broader context. It seems odd that the defense would take issue with expert testimony on DFLP insignia – so thoroughly linked to the defendant that he had photographs of his own small child wearing a DFLP headband. [Doc. 130 at 17-18]. In any case, as with other aspects of expert testimony, the jury will reach its own conclusions about DFLP, the defendant's links to DFLP, and DFLP's role the HAMAS attacks of October 7. Professor Hoffman's testimony is meant to aid the jury, not overrule its deliberative function, and it is wrong for the defense to suggest otherwise.

### C. *Expected FBI Testimony Explaining Palestinian Slang and Usage is Permissible Under FRE 701.*

Finally, in challenging some aspects of anticipated FBI agent testimony, the Defendant notes that lay opinion testimony must not be "based on scientific, technical, or other specialized knowledge within the scope of Rule 702." [Doc. 130 at 18]. That is true. The Government does not intend to cloak expert testimony as lay opinion.

The defense concedes that agents may "interpret code words when the interpretation comes from the agent's own work in the case," Opp. at 19, and that is precisely what the FBI undercover ("FBI UC") here will be doing. Just as the affiant in the criminal complaint offered opinions based on training and experience to explain context of some of the defendant's calls, *see* Doc. 1, ¶¶ 51, 54, 57, FBI agents who worked the investigation and the FBI UC, who spent hours with the Defendant, may testify concerning the meaning of such terms as "Malaka," "inside," and "dogs" in the Defendant's phone calls, or such terms as "the resistance guys" and "Al-Sinwar's picture" found in the Defendant's social media and email accounts during the course of their investigation. It should come as no surprise that FBI agents during this investigation have been to Malaka; as the affiant noted in the criminal complaint, "inside" may reasonably be taken to mean inside Israel on the morning of October 7, and so on. Similarly, the FBI UC is not an FBI linguist, but is instead fluent in the Palestinian dialect of Arabic that he used to communicate with and investigate the Defendant. As such the FBI UC came to the investigation understanding Palestinian idioms and usage and used that particularized knowledge during his investigation,

yielding a straightforward lay opinion based on direct interactions with the Defendant and a common understanding of Palestinian Arabic, not expertise developed through scientific, technical, or other specialized knowledge.

The defense's entire objection amounts to previewing appropriate cross-examination attacking the weight of the FBI UC's testimony, not its admissibility in the first place. The defense insists that the FBI UC's interpretation of Palestinian words like "Malaka" are forbidden because "[t]he investigation does not supply a settled meaning here," Opp. at 20, but of course defense attorneys will rarely if ever stipulate to a settled meaning of anything—if that were an exception, then it would swallow the rule that this type of testimony is admissible. The defense then attempts to cabin the FBI UC's investigatory function to his interactions with the Defendant by claiming him to "ha[ve] no investigation-based knowledge of the October 7 calls," Opp. at 20, when this is again false: the FBI UC, based on his personal interactions with the Defendant, was part of the investigation into the October 7 calls by identifying the Defendant's voice and using his "familiarity with [the] particular case … to provide lay opinion testimony regarding the meaning of specific words and terms used by the particular defendant[] in the case." *United States v. Staggers*, 961 F.3d 745, 761 (5th Cir. 2020). The defense next points to further disputes it intends to raise relating to translations, *see* Opp. at 21, but this all again goes to cross-examination and weight of the evidence, not whether an agent can testify to it in the first place.

The defense finally attempts to further its long-running project of pre-trying the entire case in separate hearings before this Court. This time, the defense

demands that any agent witness presenting this testimony be "qualified under Rule 702," with the Government "identify[ing] in advance each word or phrase each agent will interpret and the basis for each interpretation" and the Court "test[ing] each interpretation at a hearing outside the jury's presence before the witness offers it." Opp. at 23. The Court should decline to follow the defense down this tortured path, instead treating this testimony like any other lay agent testimony that the Government presents at trial and the defense cross-examines. For all these reasons, the Court should permit the agent testimony as lay testimony under Rule 701.

## CONCLUSION

For the reasons stated, the defendant's challenges to parts III.C (propaganda materials), III.E (expert testimony of Professor Bruce Hoffman), and III.J (FBI testimony concerning Palestinian slang) should be rejected.

Dated: October 13, 2026

Respectfully submitted,

ZACHARY A. KELLER
UNITED STATES ATTORNEY

By: */s/ D. Andrew Sigler*

ZACHARY A. KELLER
JOHN W. NICKEL
U.S. Attorney's Office – WDLA
Special Bar No. 803262 (Keller)
LA Bar No. 37819 (Nickel)
800 Lafayette Street, Suite 2200
Lafayette, Louisiana 70501
Tel: (337) 262-6618
Email: Zachary.keller@usdoj.gov

ELIZABETH J. SHAPIRO
D.C. Bar No. 418925
U.S. Department of Justice
1100 L Street NW

Washington, DC 20005
Phone: (202) 514-5302
Email: Elizabeth.Shapiro@usdoj.gov

D. ANDREW SIGLER
Ala. Bar No. 5175-I72D
Trial Attorney, Counterterrorism Section
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530
Phone: 202-514-0849
Email: Andrew.sigler@usdoj.gov

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on October 13, 2026, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

*/s/ Zachary A. Keller*
Zachary A. Keller
United States Attorney